1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11

| | |
|---|---|
| DARROW HAYGOOD, | Civil No.        08-0374-JAH (WVG) |
| Petitioner, | |
| vs. | **REPORT AND RECOMMENDATION DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS** |
| JAMES WALKER, | |
| Respondent. | |

16

17    **I.      INTRODUCTION**

18            Petitioner, Darrow Haygood (hereafter "Petitioner"), a state prisoner proceeding *pro se*, has

19    filed a First Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging

20    his conviction for two counts of robbery, true allegations that the robberies were committed while

21    voluntarily acting in concert with two or more other persons and that the offense was committed in

22    an inhabited dwelling house, personal use of a firearm in the commission of the robberies, and that

23    the robberies were committed for the benefit of, at the direction of, or in association with a criminal

24    street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members.

25    (See Respondent's Lodgment No. 1 at 139-140, 220-222.)  Petitioner contends that habeas relief is

26    proper based on the following three grounds: (1) his due process rights were violated based on

27    insufficient evidence supporting the gang enhancement allegation; (2) his due process rights were

28    violated for

1 ///

2 failure to bifurcate the gang enhancement allegation; and (3) his due process rights were violated due

3 to admission of opinion testimony.

4      The Court has reviewed the Petition, Respondent's Answer, Petitioner's Traverse, and all

5 supporting documents submitted by the parties. Based on the documents and evidence presented, and

6 for the reasons set forth below, the Court finds that Petitioner is not entitled to the relief requested and

7 recommends that the First Amended Petition be **DENIED**.

8 **II.**     **FACTUAL BACKGROUND**

9      This Court gives deference to state court findings of fact and presumes them to be correct. See

10 28 U.S.C. § 2254(e)(1); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding findings of

11 historical fact, including inferences properly drawn from such facts, are entitled to statutory

12 presumption of correctness). The facts as found by the state appellate court are substantially set forth

13 below: (See Respondent's Lodgment No. 6 at 2-14.)

14      On February 18, 2003, Petitioner and three other young men (Keyone George, Anthony

15 Gardner and another man, alleged to have been a man named Grinston) robbed Jesse and Paul Savage

16 at gunpoint[1] while they were in Jesse's bedroom at their parents' La Mesa home. Gardner had

17 previously lived at the Savage home for a period of time. The robbers, armed with guns, took about

18 $800 in cash, marijuana, numerous CDs and DVDs in cases, a cell phone, a hat, and Jesse's

19 identification card. When the robbers left, Jesse immediately called 911, telling the operator that "four

20 black guys with guns" had just robbed him, including one named Gardner, whom he believed had set

21 him up.

22      The police arrived at the Savage home within several minutes to interview Jesse and Paul. In

23 the meantime, a La Mesa police officer on patrol in the area received a dispatch call about the incident

24 and saw a black male, wearing a red shirt, pants, red sneakers and a hat later identified as belonging

25 to Jesse, running from the direction of the Savage home. The officer detained him. The man, who was

26 later identified as George, then threw the hat he was wearing on the ground. The officer patted him

27

28

     [1] Jesse Savage testified that, during the robbery, Petitioner held a sawed-off 12 gauge shotgun, and Grinston and George both held revolvers. (Respondent's Lodgment No. 2 at 88-89.)

down, finding a large wad of money, a cell phone and Jesse's identification card. After Jesse identified George in a curbside lineup as one of the robbers, George was arrested. As the officer placed George in his patrol car, George shouted "Piru."[2]

Although no gun was found in George's possession, another La Mesa police officer found a large, unloaded revolver underneath a truck parked near the Savage home, and CD cases in a grassy area near a driveway close to the home. Jesse identified the revolver as the gun George had used in the incident.

Based on the broadcast information about the incident, Gardner was arrested three days later and turned over to La Mesa Police Officer Marco Mercado, the investigating detective assigned to the case, who then interviewed him. Another subject who matched the description of one of the fleeing robbers was also turned over to Mercado. On March 31, 2003, a photographic lineup of that suspect was shown to both Jesse and Paul. Neither could identify that suspect as being involved in the robberies.

Further investigation revealed that phone numbers for Petitioner and a person named Anthony Martin appeared on Jesse's cell phone caller I.D. on the morning of the robberies. Mercado put together another photographic line-up containing Martin's photo to show Jesse and Paul later on March 31, 2003. Although Paul could not recognize anyone from that photo line-up, Jesse identified Martin as looking "like the guy with the Bengals T-shirt that [Gardner] brought. That is the guy that [Gardner] brought."

On April 9, 2003, when Mercado showed Jesse a photo line-up containing Petitioner's photo, Jesse identified Petitioner, saying, "I'm 100 percent positive that's him. He's the guy holding the gauge."[3] Based on additional investigation, which revealed that Petitioner and Martin were roommates, Mercado obtained a search warrant to search their apartment in Spring Valley. On April 12, 2003, the search warrant was executed, and the apartment was found to be vacant. Detectives then

---

[2] "Piru" refers to the Eastside Piru gang.

[3] Jesse Savage testified that Petitioner was "the guy with the 12 gauge." (Respondent's Lodgment No. 2 at 131.) "Gauge" is believed to be a reference to the sawed-off shotgun held by Petitioner during the robbery.

09cv0374

went to Petitioner's uncle's apartment in the same complex and found Petitioner there.  Although Petitioner initially denied who he was, he matched the photo that the detectives had of Petitioner and his uncle confirmed, "That's him."

Petitioner was arrested and taken to the police station where he waived his <u>Miranda</u> rights and told Mercado that he had been present at the time of the robberies in the Savage home.  Petitioner claimed that there were only three black men at the Savage home (George, Gardner and himself).  He also claimed that only George had a gun and demanded money while telling him (Petitioner) to grab some marijuana as they fled the scene.  Petitioner claimed he was not aware that the robbery was going to occur, denied he owned a black trenchcoat or a sawed-off shotgun, denied Martin was with him and the others at the residence, and denied any gang affiliation or gang banging.  Petitioner thought that Gardner had been "jumped in"[4] the Skyline Piru gang, but did not know whether George claimed to be in any gang even though he knew that George hung out with Skyline Piru gang members and had seen him making gang signs with his hands.  Mercado told Petitioner that he did not believe his story, and that it was different from what he had been told about the robbery by Jesse and Gardner, whose stories somewhat matched.  Petitioner assured Mercado he was telling the truth, that he had no criminal record, and that the other individuals that Mercado had interviewed must have been lying.

After further investigation, on May 20, 2003,[5] Grinston was arrested on the front doorstep of his sister's residence in the same complex as Petitioner's residence.  Inside the residence, Mercado and other officers found a Number 80 jersey lying on the floor and gloves with graffiti-type writing on them.  When one detective read out "East Side Piru" from the gloves, Grinston said, "Piru . . . That's me, Skyline Piru.  I'm not afraid to tell you."  Another detective found numerous pieces of red clothing

---

[4] Gang expert witness John Davis testified at Petitioner's trial that the term "jumping in" refers to a person proving himself in some type of way.  Davis explained that one way to earn  membership into a gang is "to show that [you] can hold [your] own, meaning to fight.  Some other gang members might jump you, you're going to be outnumbered, they want to see if you can hold your own." (Respondent's Lodgment No. 2 at 453.)

[5] The record is unclear whether Grinston was arrested on May 20, or May 28, 2003.  The Court will use the May 20, 2003 date, as that date is consistent with the majority of references in the record.

09cv0374

1   and a black Raiders gym bag containing George's property in the master bedroom.  Although no guns

2   were found in the apartment, a few boxes of .38 caliber ammunition were found.

3         Petitioner and Grinston, like George and Gardner, were charged with two counts of residential

4   robbery in concert with two or more other persons and that the offense was committed in an inhabited

5   dwelling house, with allegations that they personally used firearms and acted for the benefit of a

6   criminal street gang as to each count.  At Petitioner's and Grinston's trial,[6] the prosecution introduced

7   the above-noted evidence as well as the following:

8         Jesse, who had been granted limited immunity for his testimony,[7] testified that on February

9   18, 2003, he had received telephone calls from Gardner, asking if Gardner and a friend could come

10   to his place to smoke marijuana.  When his doorbell rang between 2:00 p.m. and 2:30 p.m., Jesse let

11   in Gardner and a man named "Jamal" or "Jerry," who was wearing a Bengals jersey with the number

12   80 on it.  Jesse identified Grinston in court as the man with Gardner that day.  The three then went

13   upstairs to Jesse's room to smoke marijuana.  While doing so, Jesse overheard Grinston say to

14   Gardner, "I know you're down.  I used to be just like you . . . you have to do this and you'll be cool.

15   I know you'll be down."

16         After about 15 to 20 minutes, Jesse's mother came to the room and asked if Jesse was expecting

17   anyone else because someone was ringing their doorbell.  Jesse said "no" and looked outside to see

18   two men he did not recognize.  He invited them inside and met them downstairs where they asked him

19   if Gardner and "Jerry" were there.  Jesse went back upstairs to his room and asked Gardner and

20   Grinston if they were expecting anyone.  Although they both said "no," George and the man wearing

21   a long black leather trenchcoat then entered Jesse's bedroom.  Jesse identified Petitioner at trial as the

22   man in the trenchcoat.  George got upset that Gardner was there and a brief argument ensued.

23

24   ---

    [6]  Before Petitioner and Grinston's joint trial commenced, George's trial had ended in guilty

25   verdicts and Gardner had entered a plea of guilty to robbery arising out of the events of February 18,
2003.  (Respondent's Lodgment No. 6 at 5.)

26

    [7]  Jesse had lied at George's and Petitioner's respective preliminary hearings and at George's

27   trial about the money taken in the robbery which he testified belonged to his parents when in fact it
was his own money from drug sales.  Because he did not want to get into trouble with the police, he

28   also lied that Gardner called him before the robbery to buy a television, not that the call was to smoke
marijuana.  After Jesse was confronted by his untruths, he was granted limited immunity conditioned
upon telling the truth at trial.  The jury was apprised of these facts.

09cv0374

Petitioner shook Jesse's hand and apologized for the argument, saying "Hey, I'm sorry man. I'm sorry. No disrespect." When Petitioner saw Jesse's mother look into the room to see what was happening, he said to George, "Chill out. Hey, his mom is here. His mom is here."

Shortly thereafter Jesse's mother left the home. Then, Grinston left the room and said that he was going outside to smoke a cigarette. About 30 seconds later, Grinston reentered the room with a revolver in his right hand. Without saying anything, Grinston walked toward Gardner as Petitioner pulled out a sawed-off 12 gauge shotgun from under his jacket. George pulled out a revolver and closed the door to Jesse's bedroom. Petitioner pointed the shotgun at Jesse's face, saying, "Brace [or break] yourself, where the weed at?" As Jesse pushed a little box containing marijuana toward Petitioner, he saw George and Grinston begin to ransack the room and grab his property, including his CDs. Petitioner and the others were talking to each other and at some point Jesse heard one of them say, "Piru." When Jesse told the men that he would give them whatever they wanted, Petitioner put the shotgun closer to his face and said, "I thought I told you to shut the fuck up." When Jesse continued to talk, George also pointed his gun at Jesse, telling him, "Hey, blood, shut the fuck up." At some point George picked up Jesse's identification card from the table next to his bed and put it in his pocket, saying, "Okay, bam . . . We know who you are. Jesse Savage . . . Don't you even think about calling the cops."

As the men were leaving Jesse's room, George looked at Jesse and said, "Hey . . . blood, I'm liking your hat . . . ," and he took the hat off of Jesse's head and put it on his own. When George left the room with Gardner and Grinston, Jesse could see his brother Paul coming up the stairs looking scared. As Paul tried to walk into Jesse's room, Petitioner, who was trying to leave, pushed Paul down on the bed, saying "Get the fuck out of my way." Jesse was "very badly shaken" and was "scared for [his] life" during the incident. After the men left, Jesse looked out over his balcony to see what direction they went and then called the police. The 911 tape was played for the jury. Jesse later conceded that he had lied to the 911 operator to protect Gardner, telling the operator that a gun had also been held to Gardner's head during the robberies.

Paul testified that when he left his bedroom to go downstairs to the bathroom at about 2:30 p.m., he heard voices in Jesse's room and saw a man in a black trenchcoat with a ponytail sitting on

09cv0374

the bed and talking.  About four minutes later, as he came out of the bathroom, Paul was confronted by Gardner and another black male who told him to get upstairs.  The other man, who was wearing a Bengals jersey with a number 80 on it, poked Paul in the chest with a revolver, saying "Get upstairs. I'm Piru.  I'll smoke you."  When Paul hesitated, the man put the gun to his throat and walked him upstairs with Gardner following behind.  When they reached Jesse's room, one man was leaving and the man with the trenchcoat "was grabbing the rest of the stuff [the CD cases]," and told Paul to "[l]ay down on the bed before I blow your head off with a shotgun," while others were saying, "Let's go. Let's go."  Paul identified Petitioner in court as the man with the shotgun and Grinston as the man wearing the Bengals jersey.

Various law enforcement officers testified about the physical evidence found in the case, about Jesse's immunity, and about George's arrest four blocks away from the Savage home.  Mercado testified extensively regarding the investigation, including the various photographic line-ups shown to Jesse and Paul, and his interviews with Jesse, Gardner and Petitioner.  During his interview with Gardner, Mercado learned that someone known as Trey-8, who wore the number 80 jersey which is significant to the Skyline Piru gang that began in the 1980's, was with Gardner at the Savage home during the robberies.  Mercado also read verbatim his written synopsis of Petitioner's post-arrest statement.

Martin was declared an adverse witness and testified that he had seen George, Grinston and Gardner at the apartment he shared with Petitioner on the morning that George was arrested.  He did not remember telling Mercado that George walked around saying, "We need to do this.  We need to get some money?"  Nor did he remember telling Mercado "[t]hey were planning to hit up a Mexican friend of Gardner's."  Martin claimed that he had nothing to do with the robbery and that he was not at the Savage home that day.  When Martin left the apartment that morning, he told Petitioner and the others that "it was stupid,"[8] and he did not come back until later that afternoon to find Petitioner, Gardner and a few other people there.  Martin would not answer any questions about George's or Grinston's affiliation with the Skyline Piru and East Side Piru gangs.

---

[8] "It" is believed to be a reference to the robbery which was allegedly planned at Petitioner's apartment on the morning of February 18, 2003.

On recall, Mercado testified Martin had told him that both George and Grinston claimed to be members of Skyline Piru and that they had been at the apartment with Petitioner and Gardner planning a robbery of one of Gardner's Mexican friends on February 18, 2003.  Martin also told Mercado that he had previously seen Petitioner with a long gun or rifle.

Over general defense objections, San Diego Police Detective John Davis was permitted to testify as an expert witness on criminal street gangs.  Davis testified about his qualifications, the criteria used by the Department of Justice and San Diego Police to document gang members, and black gangs in general.  Davis specifically discussed the Eastside Piru blood gang, also known as Skyline Bloods, which moved to San Diego from Los Angeles in 1980, and are rivals of the Crips gangs.  At the time of trial, there were 520 documented Eastside Piru gang members and their territory included the Skyline community of San Diego as well as Spring Valley and parts of La Mesa.  The gang was known for its robberies, homicides, drive-by shootings, narcotics sales and prostitution.  The parties stipulated that these crimes were the primary activities of the Eastside Piru or Skyline Bloods gangs and that their members, individually and collectively, engaged in such "pattern of criminal gang activity" as defined by [California Penal Code] section 186.22(e).

Davis further testified that the Eastside Piru gang identifies with the colors red and black, and with the number 80 and the term "rolling 80's" because they relate to the year that the gang originated. He explained the meaning of the terms "putting in work," "shock collars," "jumping in," "break yourself," "smoke," and "disrespect."  Davis also explained that a person could get killed for wearing gang colors and making gang signs in Piru turf without being a member, and that falsely claiming to be Piru while committing a crime would be a form of disrespect.  He testified that gang members usually worked together or with people affiliated with their gang, and their first loyalty was to the gang and not family or friends.

Davis testified of the men involved in the robbery, only Grinston was documented as an Eastside Piru gang member, having the gang names or monikers of "Trey-8" and "Lady's Man."[9] Davis explained that there are many factors in determining whether someone is a gang member, including wearing gang colors, making gang signs, claiming to be Piru, and working on intimidating

---

[9]  Grinston was not a documented Eastside Piru gang member at the time of the robberies.

09cv0374

people and being accepted by other gang members.  The facts that Grinston wore a jersey with the number 80 on it, told Paul he would "smoke" him, claimed he was Piru, and stated he was Skyline Piru when arrested in May 2003, were all criteria considered by the police when documenting him as a gang member.[10]  Davis stated that the fact Petitioner and the others were not "documented" by the San Diego Police did not necessarily mean that they were not Eastside Piru gang members.

In responding to a hypothetical question which assumed the admitted evidence as true, Davis opined that both Petitioner and Grinston had participated in the robbery "for the benefit of, at the direction of, or in association with a criminal street gang."  Davis also opined that the graffiti on the gloves found with Grinston at the time of his arrest[11] were consistent with the Eastside Piru gang.  On cross-examination, Davis conceded that it was not absolutely necessary for gang members to commit crimes in order to be in the gang, however, he noted that doing so could improve one's status in the gang.  Davis was 85 percent certain of his opinion on the hypothetical question asked in this case based on his training and experience, and stated he would be 100 percent sure if he assumed every fact in the hypothetical were proved.

Grinston presented both an alibi defense and a defense of mistaken identification.  Grinston testified that he was an inactive Skyline Piru gang member and had been babysitting for his girlfriend's children at the time of the crimes in this case.  Grinston's sister, her husband, Grinston's girlfriend, two of his girlfriend's children, and a social worker all testified in support of Grinston's alibi defense.  Both Grinston and his girlfriend had signed documents under penalty of perjury which were submitted to the San Diego County Health and Human Services to obtain payment for Grinston for babysitting his girlfriend's children, which included the date February 18, 2003.

In addition to calling a clinical psychologist who testified about the problems with cross-racial eyewitness identifications, Grinston called Gardner as a witness.  Gardner recounted his close relationship with the Savage brothers and the events of February 18, 2003, for which he had pled

---

[10] Grinston had also claimed to be a member of Eastside Piru during a field interview earlier in February 2003.

[11] Detective Mercado testified that Grinston was arrested outside the threshold of the door to an apartment, then he was placed in handcuffs and brought back inside of the residence to get him out of the view of his neighbors. (Respondent's Lodgment No. 2 at 379.) Inside the residence, Detective Mercado found two gloves lying on the floor in front of where Grinston was standing. Id. at 380.

09cv0374

guilty to robbery and was currently serving a prison term.  Gardner's version of events that day basically tracked the story that Petitioner had given Mercado prior to trial.  Gardner testified there were only three men who went to Jesse's place, that George was the only one with a gun, which he waived at Petitioner, telling him to pick up the marijuana while George grabbed some CDs, and then they all ran without ever seeing Paul.

Petitioner testified on his own behalf, stating that on February 18, 2003, he drove Gardner and George to the Savage home to smoke some marijuana with Gardner's friend Jesse.  After some time, George, at Gardner's insistence, asked Jesse about some money and snatched his hat.  George then said "break yourself," to Jesse and pulled out a gun.  When George waived the gun at Petitioner, telling him to get the marijuana, he complied because he was "not going to lose [his] life over no marijuana." When George turned the gun toward Jesse, Petitioner ran out of the room, jumped in his car and drove home alone.

Petitioner acknowledged that he was interviewed by Mercado after his arrest and that Mercado, for the most part, had accurately summarized their conversation as reflected in his report earlier in the trial.  Petitioner conceded there had been a robbery at the Savage residence but denied having any earlier conversation with George or Gardner about committing the robbery or carrying guns, and emphatically denied having any intention of going to the Savage home to commit a robbery.

On cross-examination, Petitioner stated that his statement to Mercado was longer than the one read by Mercado, and some crucial facts had been omitted.  Many of Petitioner's responses to questions about some of those omissions were contrary to what was on the audiotape of his interview with Mercado.  The prosecutor asked to play the tape of the interview for the jury.  After it was played, Petitioner acknowledged that it was his voice on the tape and that he knew the interview was being recorded.  He reiterated that he had been scared during the robberies because George was waiving the gun at him.  He did not call the police after he left the Savage home because he and George lived in the same apartment complex and he did not want "to jeopardize [him]self or [his] life."  Petitioner also admitted that he had been in a holding tank and on a bus to the courthouse with Gardner before Gardner testified at trial, but he denied talking with Gardner about the case.  Petitioner thought the

09cv0374

1  whole thing with Gardner and the trip to the Savage home "seemed funny" and that Gardner may have

2  been in on it too.

3  **III.      PROCEDURAL BACKGROUND**

4          In San Diego County Superior Court case number SCE229595, a jury found Petitioner guilty

5  of two counts of robbery [Cal. Penal Code § 211], and found true allegations that the robberies were

6  committed while acting in concert with two or more other persons and that the offense was committed

7  in an inhabited dwelling house [Cal. Penal Code § 213(a)(1)(A)], that Petitioner personally used a

8  firearm [Cal. Penal Code § 12022.53(b)], and that the robberies were committed for the benefit of a

9  criminal street gang [Cal Penal Code § 186.22(b)(1)]. (Respondent's Lodgment No. 1 at 139-40, 220-

10 222.)  The trial court sentenced Petitioner to a term of 26 years in state prison.  (Respondent's

11 Lodgment No. 1 at 226-227.)[12]/

12         Petitioner appealed his convictions to the California Court of Appeal.  (Respondent's

13 Lodgment Nos. 3, 4, 5.)  On June 22, 2005, the Court of Appeal affirmed the judgment in an

14 unpublished opinion. (Respondent's Lodgment No. 6.)

15         Petitioner filed a Petition for Review in the California Supreme Court.  (Respondent's

16 Lodgment No. 7.) On September 28, 2005, the California Supreme Court denied the Petition without

17 comment.  (Respondent's Lodgment No. 8.)

18         On September 26, 2006, Petitioner filed a Petition for Writ of Habeas Corpus in the California

19 Court of Appeal.  (Respondent's Lodgment No. 9.)  On August 28, 2007, the Court of Appeal denied

20 the Petition.  (Respondent's Lodgment No. 10.)

21         On August 28, 2007, Petitioner filed a Petition for Writ of Habeas Corpus in the California

22 Supreme Court.  (Respondent's Lodgment No. 11.)  On February 13, 2008, the California Supreme

23 Court denied the Petition.  (Respondent's Lodgment No. 12.)

24         On February 27, 2008, Petitioner filed a Petition for Writ of Habeas Corpus in this Court.

25 (Doc. 1.)  On March 15, 2008, the Court dismissed the Petition.

26

27

28
          [12] The same jury completely acquitted Grinston.  (Respondent's Lodgment No. 1 at 88, 91, 152.)

On April 1, 2008, Petitioner filed in this Court a First Amended Petition for Writ of Habeas Corpus.  On May 22, 2008, the Court issued a Report and Recommendation recommending that the First Amended Petition be dismissed without prejudice based on Petitioner's failure to exhaust his Claims Nos. 1, 2, 4, and 6 in state court.  On October 15, 2008, the Court issued an Order Adopting in Part the Report and Recommendation finding the First Amended Petition unexhausted as to Claims Nos. 1, 2, and 6 and ordering a further response from Petitioner.

On November 3, 2008, Petitioner filed a Motion to Stay the Proceedings in this Court to allow him to return to state court to exhaust Claims Nos. 1, 2, and 6.  On January 26, 2009, this Court issued a Report and Recommendation recommending that the Motion to Stay be denied.  On September 25, 2009, the District Court issued an Order Adopting the Report and Recommendation and Denying the Motion to Stay.

On October 5, 2009, Petitioner formally abandoned his unexhausted Claims Nos. 1, 2, and 6. On October 15, 2009, this Court ordered a response to the First Amended Petition.  On February 9, 2010, Respondent filed an Answer to the First Amended Petition.  (Doc. 35.)  On March 10, 2010, Petitioner filed a Traverse to Respondent's Answer.  (Doc 36.)

**IV.**     **SCOPE OF REVIEW**

This Petition is governed by Title 28, United States Code, § 2254, as amended by the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA").  Section 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).

As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> > (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme Court of the United States; or

1
2

(2) resulted in a decision that was based on an <u>unreasonable</u> <u>determination</u> of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2) (2006) (emphasis added).

3   "AEDPA establishes a 'highly deferential standard for evaluating state-court rulings, which

4   demands that state-court decisions be given the benefit of the doubt.'" <u>Womack v. Del Papa</u>, 497 F.3d

5   998, 1001 (9th Cir. 2007) [quoting <u>Woodford v. Viscotti</u>, 537 U.S. 19, 24 (2002)]. To obtain federal

6   habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). <u>See</u> <u>Williams v. Taylor</u>, 529

7   U.S. 362, 403 (2000). The Supreme Court has ruled that the "contrary to" clause of § 2254(d)(1)

8   permits a grant of habeas relief "if the state court arrives at a conclusion opposite to that reached by

9   this Court on a question of law or if the state court decides a case differently than this Court has on

10  a set of materially indistinguishable facts." <u>Id.</u> at 412-13. The Supreme Court has also interpreted the

11  "unreasonable application" clause of § 2254(d)(1) to allow a grant of "the writ if the state court

12  identifies the correct governing legal principle from this Court's decisions but unreasonably applies

13  that principle to the facts of the prisoner's case." <u>Id.</u> at 413. The Supreme Court has clarified that

14  under § 2254(d)(2) even an erroneous or incorrect application of clearly established federal law does

15  not support a habeas grant, unless the state court's application was "objectively unreasonable."

16  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003).

17  Where there is no reasoned decision from the state's highest court, the Court "looks through"

18  to the underlying appellate court decision. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 805-06 (1991).

19  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts

20  must conduct an independent review of the record to determine whether the state court's decision is

21  contrary to, or an unreasonable application of, clearly established Supreme Court law. <u>See</u> <u>Delgado</u>

22  <u>v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000) (overruled on other grounds by <u>Lockyer</u>, 538 U.S. at

23  75-76). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus

24  claim. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). Absent citations to Supreme Court precedent, habeas

25  relief is not merited if the state court decision neither contradicts the reasoning nor the result of

26  Supreme Court rulings. <u>Id.</u>

27
28

13

## V.    DISCUSSION

Petitioner presents the Court with three claims for habeas relief.  He argues that habeas relief is proper based on the following three grounds: (1) his due process rights were violated based on insufficient evidence supporting the gang enhancement allegation; (2) his due process rights were violated for failure to bifurcate the gang enhancement allegation; and (3) his due process rights were violated due to admission of opinion testimony.

### A. Petitioner's Due Process Rights Were Not Violated Because There Was Sufficient Evidence to Support The Gang Enhancement Allegation.

Petitioner contends that his due process rights were violated because there was insufficient evidence to support the true findings of the gang enhancement allegation.  (First Amended Petition at 54-58.)  Specifically, Petitioner contends that the evidence was insufficient to support the criminal street gang enhancement with regard to each robbery count because there was no evidence that he committed those crimes "with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (Respondent's Lodgment No. 6 at 36.); Cal. Penal Code § 186.22(b)(1). Respondent argues that there was substantial evidence that Petitioner committed the robberies for the benefit of the Piru gang and with the specific intent to promote the gang.  (Answer at 11.)

In the California Court of Appeal, Petitioner challenged the sufficiency of the evidence upon which he was convicted.  The California Court of Appeal denied Petitioner's appeal.  He then filed a Petition for Review in the California Supreme Court which denied his Petition without comment. (Respondent's Lodgment No. 8.)  The last reasoned state decision which addressed the merits of the claim is the California Court of Appeal's opinion affirming Petitioner's conviction on the gang enhancement allegation.  (Respondent's Lodgment No. 6.)  It is to that decision this Court must direct its analysis.  Ylst, 501 U.S. at 805-06.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991).  As the Supreme Court noted in Dowling, "the category of infractions that violate 'fundamental fairness' is a very narrow one." Dowling v. United States, 493 U.S. 342, 352, (1990). The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except

1   upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he

2   is charged." In re Winship, 397 U.S. 358, 364 (1970).  The Supreme Court reiterated in Dowling,

3   when determining whether a due process violation has occurred, courts "are to determine only whether

4   the action complained of . . . violates those fundamental conceptions of justice which lie at the base

5   of our civil and political institutions, and which define the community's sense of fair play and

6   decency." Dowling, 493 U.S. at 353.

7        The clearly established federal law regarding sufficiency of the evidence claims in the criminal

8   context is set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979).  In Jackson, the Court held that

9   the Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to habeas

10  corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact

11  could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324.  In making this

12  determination, habeas courts must respect the province of the jury to determine the credibility of

13  witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by

14  assuming the jury resolved all conflicts in a manner that supports the verdict. Id. at 319.  Once a state

15  court fact finder has found a defendant guilty, federal habeas courts must consider the evidence "in

16  the light most favorable to the prosecution."  Id.  Federal habeas courts must also analyze Jackson

17  claims "with explicit reference to the substantive elements of the criminal offense as defined by state

18  law." Id. at 324 n. 16 (emphasis added).

19       The Ninth Circuit has stated that: "After AEDPA, we apply the standards of Jackson with an

20  additional layer of deference." Juan H. v. Allen, 408 F.3d 1262, 1275 (9th Cir. 2005).  In Allen, the

21  Ninth Circuit first reviewed the standard of review applied by the state appellate court to a sufficiency

22  of the evidence claim, and found that although the state court did not cite to the relevant federal case

23  law, "such a citation is not required 'so long as neither the reasoning nor the result of the state-court

24  decision contradicts' Supreme Court precedent." Id. at 1274 n. 12 [quoting Early v. Packer, 537 U.S.

25  at 8].

26       Viewing the evidence "in the light most favorable to the prosecution," as this Court must, it

27  is clear that sufficient evidence was adduced at trial to support the specific intent requirement of the

28  gang enhancement allegation under California law.  Jackson, 443 U.S. at 319.

Petitioner contends that there was insufficient evidence on the second element of the charged crime: "with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b). To support this argument, Petitioner claims that because he "was not a gang member, the victim was not a gang member, the crime was not committed in gang territory to benefit a gang, and the prosecution's theory that Petitioner, a non-gang member, robbed another non-gang member with the specific intent of benefitting a gang is unsupported by the evidence." (First Amended Petition at 54.) Petitioner asserts that the prosecution was required "to prove that a 'gang member' participated in the crime, or at least had something to do with it" in order to prove that he acted with the specific intent to promote, further, or assist in any criminal conduct by gang members. Id. Petitioner also argues that "co-defendant Jerry Grinston was the only documented gang member named in the trial, and the jury found him not guilty on alibi evidence." He claims that "Grinston's acquittal bars the jury's verdict against Petitioner on the gang allegation by negating specific intent to promote, further, or assist in any criminal conduct by gang members." Id. Petitioner concludes that because "Grinston wasn't there, and there is no evidence that [Petitioner] had any other connection with the crime," there was insufficient evidence to convict on the gang enhancement allegation. Id.

The Court of Appeal denied this claim, stating:

Because '[t]here is rarely direct evidence of a defendant's intent[, s]uch intent must usually be derived from all the circumstances . . . , including the defendant's actions. [Citation.]' Specifically, with regard to the specific intent to commit a particular crime, such may be inferred from the circumstances connected with that crime. Here, there was evidence before the jury that Petitioner, Gardner, Grinston and George were at Petitioner's apartment planning a robbery the morning of February 18, 2003, and that the men split up to arrive at different times at the Savage home where Gardner's friend, who sold drugs, lived. The evidence also establishes Petitioner was there when the men used terms identified with the Piru gang both before and during the robbery, that at least George and Grinston were wearing clothes at that time also identified with the Piru gang, and that Petitioner apologized for George's behavior when he realized Jesse's mother was at the residence, adding 'no disrespect.' The record shows that one of the men called out Piru while taking property from Jesse's room; that Petitioner pulled out a shotgun from under his trenchcoat when Grinston entered Jesse's room with a gun drawn; and that George in Petitioner's presence threatened Jesse after picking up Jesse's identification card. Petitioner also threatened Paul with the shotgun as he took CDs and left the room, and an expert opined a hypothetical robbery such as the present case, was gang related and committed for the benefit of the Piru gang based on assuming the truth of the facts in evidence in this case. Based on the totality of this evidence, the jury could reasonably infer the robberies of Jesse and Paul were gang

related and Petitioner acted with the specific intent of promoting, furthering or assisting the Piru gang in committing them.
(Respondent's Lodgment No. 6 at 37.) (citations omitted).

The California Court of Appeal also concluded that the fact that Petitioner "was not a documented Piru gang member does not necessarily show he did not commit the robbery for the benefit of the Piru gang or that the robbery was not gang related as he claims." <u>Id.</u> Finally, the appellate court held:

> To the extent Petitioner is claiming that the robbery cannot be shown to be gang related because only Grinston had gang ties and was not found guilty, his argument fails. Petitioner made the same claim in his new trial motion, which the trial court properly denied, finding even if Grinston was not the person involved in the robbery, whoever was there was wearing the number 80 jersey and uttering gang terms and claiming to be Piru along with the others during the robbery.
> (Respondent's Lodgment No. 6 at 38.)

In order for a gang enhancement allegation under California Penal Code section 186.22(b) to be found true, the prosecution must prove that the crime for which the defendant was convicted had been (1) committed for the benefit of, at the direction of, or in association with any criminal street gang, and (2) with the specific intent to promote, further, or assist in any criminal conduct by gang members. Cal. Penal Code § 186.22(b). In addition, the prosecution must prove the predicate elements that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) included members who either individually or collectively have engaged in a pattern of criminal gang activity by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period. [Citation.]" Cal. Penal Code § 186.22(f).

Here, the parties stipulated to the predicate offenses element at trial. On appeal, Petitioner did not contest the fact that Piru is an ongoing criminal street gang within the meaning of California Penal Code § 186.22(f), or that one of the gang's primary activities is the commission of robberies which is one of the crimes listed in the gang enhancement statute. (Respondent's Lodgment No. 6 at 36.) Instead, Petitioner's argument focuses on his claim that the evidence was insufficient to support the criminal street gang enhancement with regard to each robbery count because there was no evidence that he committed those crimes "with the specific intent to promote, further, or assist in any criminal

1   conduct by gang members." Cal. Penal Code § 186.22(b).  Petitioner concedes that the evidence may

2   have shown that Gardner robbed his former roommate to perhaps join the Piru gang, but claims that

3   the evidence showed that Petitioner was not aware of that fact, nor was he a gang member.

4   (Respondent's Lodgment No. 6 at 36.)  Petitioner asserts the evidence shows no more than that he

5   committed the crimes to steal money and drugs, and the prosecution theory of the robberies in this

6   case

7   being gang crimes is pure speculation.  Id.  The California Court of Appeal disagreed with Petitioner's

8   argument.  Id.

9        This Court agrees with the California Court of Appeal.  The record presented to the Court

10   contains substantial evidence that Petitioner's actions on the day of the robberies were related to gang

11   activity.  Petitioner was with Gardner, Grinston and George, who used terms identified with the Piru

12   gang both before and during the robberies.  At least two of the men that Petitioner was with were

13   wearing clothes at that time that identified with the Piru gang, and one of the men called out "Piru"

14   during the commission of the robberies.  Further, an expert witness on street gangs testified that a

15   hypothetical robbery such as the present case was gang related and was committed for the benefit of

16   the Piru gang.  The expert witness based his opinion on the assumption of the truth of the facts in

17   evidence in the case.  Therefore, the jury could reasonably infer from the totality of the evidence that

18   the robberies were gang related and that Petitioner acted with the specific intent of promoting,

19   furthering, or assisting the Piru gang in committing them.  (Respondent's Lodgment No. 6 at 37.)

20        Petitioner relies on Garcia v. Carey, 395 F.3d 1099 (9th Cir. 2005) to support his argument that

21   specific intent to promote, further, or assist in any criminal conduct by gang members was negated by

22   the acquittal of Petitioner's co-defendant, Grinston.  (First Amended Petition at 56.)  In Garcia, the

23   jury found the gang-member defendant guilty of robbery and found the gang enhancement allegations

24   to be true.  Garcia, 395 F.3d at 1102.  The Ninth Circuit noted that while the gang expert witness in

25   Garcia testified about three other robberies committed by members of the defendant's gang within a

26   few months prior to the defendant's robbery, the expert witness' testimony was "singularly silent on

27   what criminal activity of the gang was furthered or intended to be furthered by the [defendant's]

28   robbery."  Id. at 1103.  The Ninth Circuit also found that there was "nothing inherent in the robbery

09cv0374

1  that would indicate that it further[ed] some other crime." Id.  Additionally, the Ninth Circuit found

2  that nothing in the record could support an inference that the defendant committed the robbery with

3  the specific intent to facilitate other criminal conduct by his gang.  Id.  Therefore, the Ninth Circuit

4  affirmed the district court's grant of habeas relief.  Id. at 1100.

5       In reaching its decision in Garcia, the Ninth Circuit relied in part on the California Supreme

6  Court's decision in People v. Gardeley, 14 Cal. 4th 605 (1996).  In Gardeley, the expert witness

7  testified that the assault at issue was a "classic" example of gang-related activity.  Id. at 619.  The

8  expert witness further explained that "criminal street gangs rely on such violent assaults to frighten

9  the residents of an area where the gang members sell drugs, thereby securing the gang's drug-dealing

10 stronghold."  Id.  The Gardeley court held that such testimony permitted the jury to reasonably find

11 that the attack was committed with the requisite specific intent.  Id. at 620.  While there was no

12 comparable evidence in Garcia, there is comparable evidence in this case.  Garcia, 395 F.3d at 1104.

13 Here, although the gang expert witness conceded that it was not absolutely necessary for gang

14 members to commit crimes in order to be in the gang, he explained that doing so could improve one's

15 status in the gang. (Respondent's Lodgment No. 6 at 11.)  The gang expert witness also explained that

16 falsely claiming to be a member of the Piru gang while committing a crime would be a form of

17 disrespect.  (Respondent's Lodgment No. 6 at 11.)  Further, the record shows that Jesse Savage

18 testified that Gardner arrived at his parent's home on the day of the robberies with Grinston, who was

19 wearing a Bengals jersey with the number 80 on it, and who then gave Gardner a "pep talk" about

20 being "down" and proving himself to "these guys" before Petitioner and George showed up at the

21 apartment about 20 minutes later.  (Respondent's Lodgment No. 6 at 19.)  The record also shows that

22 during the commission of the robberies, the man wearing the Bengals jersey with the number 80 on

23 it poked Paul in the chest with a revolver saying, "Get upstairs.  I'm Piru.  I'll smoke you."

24 (Respondent's Lodgment No. 6 at 8.)  The police officer who arrested George stated George shouted

25 "Piru" as he was placed in the police car, and another officer testified that Grinston blurted out,

26 "That's me, Skyline Piru.  I'm not afraid to tell you," in response to graffiti being read off of the pair

27 of gloves found near Grinston when he was arrested.  (Respondent's Lodgment No. 6 at 21.)

28 Therefore, the gang expert witness' testimony in this case, along with the other evidence described

above, was sufficient to establish Petitioner's specific intent to promote, further, or assist in Eastside Piru's criminal conduct under Gardeley.

Unlike Garcia, the record in this case **does** support a rationale inference of specific intent to promote, further, or assist in other criminal conduct by gang members.  The gang expert witness in this case, in contrast to the gang expert witness in Garcia, was not "singularly silent" on what criminal activity of Piru was furthered, or intended to be furthered, by participating in the robberies.  At trial, the gang expert witness testified that the Eastside Piru gang was known for its robberies, homicides, drive-by shootings, narcotics sales and prostitution.  (Respondent's Lodgment No. 6 at 10.)  Additionally, the parties stipulated that these crimes were the primary activities of the Eastside Piru or Skyline Bloods gangs, and that their members, individually and collectively, engaged in such "pattern of criminal gang activity" as defined by California Penal Code section 186.22(e).  Id.  Also, the gang expert witness testified that Eastside Piru identifies with the colors red and black, as well as with the number 80 because the gang originated in 1980.  (Respondent's Lodgment No. 6 at 11.)  Further, the expert witness explained the meaning of certain terms such as "break yourself," "smoke," and "disrespect."  Id.  He testified that a person could be killed for wearing gang colors and making gang signs in the Eastside Piru gang's turf without being a Piru member.  Id.  The expert witness testified that gang members usually work together or with people affiliated with their gang.  Id.  In this case, there was evidence before the jury that Petitioner, Gardner, Grinston and George were at Petitioner's apartment planning a robbery on the morning of February 18, 2003.

Moreover, the expert witness testified that the facts that Petitioner's co-defendant, Grinston, wore a jersey with the number 80 on it, told one of the robbery victims that he would "smoke" him, claimed that he was Piru, and stated that he was Skyline Piru when he was arrested, were all criteria considered by the police when documenting a gang member.  Id.  Petitioner claims that because Grinston was the only documented gang member, his acquittal also "bars the jury's verdict against Petitioner on the gang allegation."[13]  (First Amended Petition at 56.)  Petitioner also contends that the

---

[13]   The jury could have found that Grinston had an alibi, but evidence was presented that Petitioner was at the Savage home with a man wearing a number 80 jersey, and that Jesse overheard "Piru" during the commission of the robberies.

09cv0374

"quoted language" of the statute "requires the prosecution to prove that a 'gang member' participated in the crime, or at least had something significant to do with it."  However, the gang expert witness testified that the fact that Petitioner and the others were not documented by the San Diego Police did not necessarily mean that they are not members of the Eastside Piru gang.  (Respondent's Lodgment No. 6 at 11-12.)

Therefore, viewing this evidence in the light most favorable to the judgment, it is entirely reasonable that the jury found the gang enhancement allegations to be true.  The Court respects the province of the jury to resolve evidentiary conflicts, which it clearly did, because all conflicts in the evidence were resolved in a manner that supported its verdict.  Jackson, 443 U.S. at 319.

Accordingly, there was sufficient direct and circumstantial evidence in the record to support the jury's conclusion that Petitioner had committed the robberies with the specific intent to promote, further, or assist in criminal conduct by gang members.  The appellate court's denial of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  Therefore, the Court RECOMMENDS that Petitioner's claim for habeas relief in this regard be **DENIED**.

### B. Petitioner's Due Process Rights Were Not Violated Because Bifurcation of the Gang Enhancement Allegation Was Not Required.

Petitioner contends that his due process rights were violated because failure to bifurcate the gang enhancement allegation from the substantive counts resulted in gross unfairness.  (First Amended Petition at 59-60.)  Specifically, Petitioner claims that the "introduction of the gang evidence during the trial of the substantive offenses posed a substantial risk of prejudice."  (First Amended Petition at 60.)  Respondent argues that Petitioner "cannot demonstrate that the state court's rejection of his claim was contrary to, or an unreasonable application of, controlling United States Supreme Court authority or the facts presented."  (Answer at 12.)

In the California Court of Appeal, Petitioner challenged the failure to bifurcate the trial of the gang enhancement allegation from the underlying substantive offenses.  The Court of Appeal denied Petitioner's appeal.  He then filed a Petition for Review in the California Supreme Court which denied his Petition without comment.  (Respondent's Lodgment No. 8.)  The last reasoned

1    state decision which addressed the merits of the claim is the California Court of Appeal's opinion

2    affirming Petitioner's conviction with the gang enhancement.  (Respondent's Lodgment No. 6.)  It

3    is to that decision this Court must direct its analysis.  Ylst, 501 U.S. at 805-06.

4        "In conducting habeas review, a federal court is limited to deciding whether a conviction

5    violated the Constitution, laws, or treaties of the United States."  Estelle, 502 U.S. at 68.  As the

6    Supreme Court noted in Dowling, "the category of infractions that violate 'fundamental fairness'

7    is a very narrow one."  Dowling, 493 U.S. at 352.  The Due Process Clause of the Fourteenth

8    Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt

9    of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S.

10   at 364.  The Supreme Court reiterated in Dowling, when determining whether a due process

11   violation has occurred, courts "are to determine only whether the action complained of ... violates

12   those fundamental conceptions of justice which lie at the base of our civil and political institutions,

13   and which define the community's sense of fair play and decency."  Dowling, 493 U.S. at 353.

14       Under California law, a trial court has broad discretion to control the conduct of a criminal

15   trial and has the power to bifurcate the trial of a gang enhancement from the trial of the substantive

16   offense.  People v. Hernandez, 33 Cal. 4th 1040, 1048 (2004).  "[E]vidence of gang membership is

17   often relative to, and admissible regarding, the charged offense. . . To the extent the evidence

18   supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice

19   would be dispelled, and bifurcation would not be necessary."  Id. at 1049-1050.  The key finding

20   to be made by the habeas court is whether introduction of the evidence in the substantive counts

21   was fundamentally unfair.  Estelle v. McGuire, 502 U.S. 62 (1991).  "In evaluating prejudice for

22   failure to bifurcate, the federal habeas court focuses particularly on cross-admissibility of evidence

23   and the danger of 'spillover' from one charge to another, especially where one charge or set of

24   charges is weaker than another."  Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).  Undue

25   prejudice also exists whenever joinder of counts allows evidence of other crimes to be introduced

26   in a trial where the evidence would otherwise be inadmissible.  Sandoval v. Calderon, 241 F.3d

27   765, 772 (9th Cir. 2001).  Petitioner bears the burden of demonstrating that the trial court's

28   decision to deny bifurcation rendered his trial fundamentally unfair.  Davis, 384 F.3d at 638.

Petitioner contends that the admission of the gang evidence as to him was grossly unfair because "not one of these facts bears on Petitioner's intent or involvement in the robbery." (First Amended Petition at 59.) He attempts to demonstrate gross unfairness by stating that the gang evidence was not relevant to him because he was not a documented gang member. Id. at 60. Instead, he claims that the gang evidence was only relevant to his co-defendant's motive or intent to commit the robberies. Petitioner also claims the "pep talk" evidence between Grinston and Gardner, as well as any use of gang language by George or Grinston during the robberies was irrelevant and hearsay as to his own motive or intent because they were not made in his presence. Id. He claims that most of the gang evidence was properly admissible only against his co-defendant, Grinston. Id.

The Court of Appeal affirmed Petitioner's conviction on the gang enhancement allegation, finding that:

> The trial court was well within its discretion to deny the bifurcation motion as the gang evidence was relevant to both the enhancement allegations and the underlying offenses. The proffered evidence was relevant to show that Petitioner and the other assailants were acting in concert in committing the robberies, a necessary element of the underlying offenses.
> (Respondent's Lodgment No. 6 at 19.)

Petitioner's counsel conceded that the proffered evidence was relevant to show that Petitioner and the other assailants were acting in concert in committing the robberies. Id. The court also found that the evidence "was . . . relevant to counter Petitioner's defense that he unknowingly participated in the crime because George waived a gun at him, and to a possible motive of gaining respect for the gang and for himself within the gang." Id. Given the level of significance of the gang evidence, the trial court properly ruled that its relevance was not substantially outweighed by its prejudicial effect. (Respondent's Lodgment No. 6 at 19-20.)

The Court of Appeal noted that, in claiming the gang evidence was irrelevant to his case, Petitioner ignored the fact that the evidence at trial revealed that the robberies were gang motivated, and that the jury did not have to believe Petitioner's version of the facts in which he claimed he did not know about nor did he intend to commit the robberies. (Respondent's Lodgment No. 6 at 22.) The Court of Appeal added that Petitioner did not appreciate that the gang

expert witness had testified that just because a person is not documented as a gang member by the San Diego Police does not mean that the person is not a gang member; it only means the person has not yet met the five criteria for such documentation.  Id.  Petitioner admitted he was at the Savage home during the robberies and that he took some marijuana because George told him to do so, or because George pointed his gun at him.  Id.  Either way, Petitioner's intent and motive in participating in the robberies was at issue.  The Court of Appeal concluded that, in light of the properly admitted co-conspirator's statements, and that Petitioner's counsel did not object to the usage of gang terminology, the record does not reflect any error in the admission of the gang evidence which would render the trial grossly unfair or constitute a denial of Petitioner's right to due process.  (Respondent's Lodgment No. 6 at 22-23.)

As the Ninth Circuit stated in Davis, the federal habeas court evaluates prejudice for failure to bifurcate by focusing particularly on cross-admissibility of evidence and the danger of spillover from one charge to another.  Davis, 384 F.3d at 638.  Here, as the trial court noted in its ruling, the evidence of gang affiliation was admissible "for an understanding of the evidence, the nomenclature, terminology."  (Respondent's Lodgment No. 2 at 25.)  The trial court also observed "that expert testimony is something that will be of assistance to the jury, and, consequently, that an expert may testify."  (Respondent's Lodgment No. 2 at 25.)  Also, the trial court stated that "inasmuch as the issues are intertwined on the issue of guilt or innocence as to the underlying offenses and the allegation itself," there was not a particular purpose to bifurcate the trial.  (Respondent's Lodgment No. 2 at 25-26.)  Petitioner's counsel noted before trial that he assumed "that most of the evidence on that allegation will come in during the principal portion of the trial."  (Respondent's Lodgement 2 at 19.)  Also, Petitioner's counsel told the court that he would favor a stipulation regarding George and another person named, as being Piru gang members because he thought "it would be unfavorable to parade all of the negative factual evidence before the jury about bad things that those individuals did and how they became documented street gang members."  (Respondent's Lodgment No. 2 at 21.)

The trial court's denial of Petitioner's motion to bifurcate the gang enhancement allegation did not render his trial fundamentally unfair.  There was no abuse of discretion because the gang

24

09cv0374

evidence also was relevant on the issues of Petitioner's motive and intent and was not unduly prejudicial, so it did not sway the jury's verdict.  Petitioner's motive and intent in participating in the robberies were at issue.  Testimony from the gang expert witness described how new gang members "put in work" committing crimes for the gang to gain respect and recognition within the gang and to advance the gang's reputation in the community.  (Respondent's Lodgment No. 6 at 22.)  This testimony was relevant to explain why the group may have committed the robberies and why Petitioner may have participated in them.  Evidence adduced at trial showed that Petitioner, Gardner, Grinston and George were at Petitioner's apartment planning a robbery on the morning of February 18, 2003, and that Petitioner was present when the men used terms identified with the Piru gang both before and during the robberies.  The record also shows Jesse Savage's testimony regarding Gardner arriving at his parent's home on the day of the robberies with Grinston, who was wearing a Bengals jersey with the number 80 on it, and who then gave Gardner a "pep talk" about being "down" and proving himself to "these guys" before Petitioner and George showed up at the apartment about 20 minutes later.  (Respondent's Lodgment No. 6 at 19.)  The evidence reveals that one of the men called out "Piru" while taking property from Jesse's room, and that Petitioner pulled out a shotgun from under his trenchcoat while at the Savage home. (Respondent's Lodgment No. 6 at 37.)  Clearly, the record contained extensive proof that the gang evidence would show a significant relationship to the events in the underlying crimes. (Respondent's Lodgment No. 6 at 19.)

Even assuming that the trial court should have bifurcated the gang enhancement from the underlying offenses, Petitioner has failed to demonstrate any prejudice.  Petitioner argues that the gang evidence admitted against him "was very prejudicial and highly inflammatory," and that "even though issues and evidence were relatively straightforward," there was a "risk of substantial prejudice from spillover effect of conspiracy evidence" of the gang expert's testimony that Petitioner engaged in a conspiracy to commit the robberies for the benefit of a criminal street gang. (First Amended Petition at 60.)  To the contrary, as discussed above, the gang expert witness' testimony was admissible to prove both Petitioner's motive and intent.  Therefore, since Petitioner was not prejudiced by the decision to deny bifurcation of the gang enhancement allegation, the

09cv0374

trial court's decision was not fundamentally unfair and did not violate due process.  The Court RECOMMENDS that this claim be **DENIED**.

### C. Admission of Opinion Testimony Did Not Violate Petitioner's Due Process Rights.

Petitioner contends that the introduction of Detective Mercado's opinions that Petitioner was lying, and Jesse Savage and other witnesses were telling the truth, violated his right to a fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment.  (First Amended Petition at 61.)  Specifically, Petitioner contends that Detective Mercado's audiotaped interview of him at the time of his arrest included lay opinion about his veracity, and that "lay opinion testimony about the veracity of a witness or a defendant is inadmissible."  Id.  Respondent argues that Petitioner "cannot demonstrate that the state court's rejection of his claim was contrary to, or an unreasonable application of, controlling United States Supreme Court authority or the facts presented."  (Answer at 17.)

In Petitioner's appeal to the California Court of Appeal, he challenged the admissibility of the audiotape of Detective Mercado's interview.  During the interview, Detective Mercado told Petitioner that he did not believe his story, and that Petitioner's story was different from what he had been told about the incident by both Jesse and Gardner, whose stories somewhat matched.  The California Court of Appeal denied Petitioner's appeal.  He then filed a Petition for Review in the California Supreme Court which denied his Petition without comment.  (Respondent's Lodgment No. 8.)  The last reasoned state decision which addressed the merits of the claim is the California Court of Appeal's opinion affirming Petitioner's conviction.  (Respondent's Lodgment No. 6.)  It is to that decision this Court must direct its analysis.  Ylst, 501 U.S. at 805-06.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle, 502 U.S. at 68.  As the Supreme Court noted in Dowling, "the category of infractions that violate 'fundamental fairness' is a very narrow one."  Dowling, 493 U.S. at 352.  The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. at 364.  The Supreme Court reiterated in Dowling, when determining whether a due process

09cv0374

violation has occurred, courts "are to determine only whether the action complained of ... violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." <u>Dowling</u>, 493 U.S. at 353.

Petitioner contends that Detective Mercado's opinion that Petitioner was lying during his post-arrest interview should not have been presented to the jury. During the prosecution's case-in-chief, Detective Mercado read verbatim a two page summary of his post-arrest interview with Petitioner. An unredacted audiotape of the interview also was played during the prosecution's cross-examination of Petitioner. The Court of Appeal denied this claim, finding that "Mercado did not opine in his testimony at trial that Petitioner was lying and Jesse and Gardner were telling the truth." (Respondent's Lodgment No. 6 at 31.)

The trial court gave Petitioner's counsel the options of having the prosecutor ask questions of Detective Mercado about Petitioner's interview or, having the audiotape of the interview played and then asking questions about the entire conversation. <u>Id.</u> Petitioner's counsel decided that he would rather have Detective Mercado read "verbatim the two pages in his report, that report on the conversation." (Respondent's Lodgment No. 6 at 29.) Following this decision by Petitioner's counsel, Detective Mercado read to the jury a two page synopsis of his conversation with Petitioner. However, during the prosecution's cross-examination of Petitioner, Petitioner denied saying certain things to Detective Mercado during his post-arrest interview. During a sidebar conference, the prosecutor requested to play the audiotape of the interview in order to impeach Petitioner with his prior inconsistent statements. Notably, Petitioner's counsel did not object, and the court ruled that the audiotape was admissible for impeachment purposes. Grinston's counsel remarked to the court that there were many portions of the audiotape that had nothing to do with prior inconsistent statements. (Respondent's Lodgment No. 2 at 1145.) The trial court stated, "Well, those are all admissions by the [Petitioner]. . . And they'll come in as admissions, and the ones that are prior inconsistent statements or prior consistent statements come in on that ground." <u>Id.</u> Petitioner's counsel then objected that the admissions in the audiotape were redundant and cumulative because identity was not an issue since Petitioner had already admitted to being at the Savage home during the robberies. The court overruled the objection on the basis that Petitioner's

1  counsel had made intent an issue in the trial, and Petitioner's statements in the audiotaped

2  interview offered evidence of Petitioner's intent.  (Respondent's Lodgment No. 6 at 30.)  Here,

3  Petitioner's argument focuses on his claim that Detective Mercado's opinion that Petitioner was

4  lying and other witnesses were telling the truth should not have been introduced because Detective

5  Mercado's opinion was inadmissible evidence.  The California Court of Appeal disagreed with

6  Petitioner's argument.  (Respondent's Lodgment No. 6 at 36.)

7        The Court of Appeal noted that the record clearly shows that Petitioner's counsel had

8  initially requested the reading of Detective Mercado's summary which included the detective's

9  observation that Petitioner's story differed from other witnesses that Detective Mercado had

10  already interviewed.  Id. at 31.  Petitioner's counsel at that time gave his tactical reasons for

11  proceeding in such manner by acknowledging to the trial court that "to the extent that [Petitioner]

12  makes admissions, it's admissible, like he was there, one or two other young men were with him,

13  he . . . describes the victims, he describes the place."  Id. at 28.

14        The Court of Appeal also stated:

15        The actual statements which were played to the jury for impeachment of Petitioner
       added no new comments or opinions by Mercado.  In addition to most of the
16        information in the summary and on the tape being admissible as prior consistent or
       inconsistent statements as the trial court properly found, much of it tracked Petitioner's
17        own trial testimony and showed he stood firm in his story even when confronted
       during questioning pretrial.
18        (Respondent's Lodgment No. 6 at 31.)

19        The audiotape of the interview also included Petitioner's favorable statement that he did

20  not have any kind of criminal record, along with Petitioner's own claims that the other witnesses

21  were lying.  Id.

22        This Court agrees with the California Court of Appeal.  The record presented to the Court

23  clearly shows that Petitioner's counsel initially requested that Detective Mercado read to the jury

24  his summary of the interview with Petitioner, conceding that he thought that "the balance of it,

25  unfortunately, is admissible."  (Respondent's Lodgment No. 6 at 28.)

26        Petitioner's claim involves the issue of whether statements made by a police officer during

27  a taped interview fall within the purview of "opinion testimony."  "'[T]estimony'" refers only to

28  statements made under oath or affirmation."  United States v. Salerno, 505 U.S. 317, 322 (1992)

09cv0374

[citing <u>Black's Law Dictionary</u> 1476 (6th ed. 1990)].  In contrast, Detective Mercado's statements in the taped interview were not offered as testimony.  Rather, his statements in the taped interview were part of an investigation, and the statements were not made under oath.  Furthermore, it would be logical to assume that a jury would not afford the same level of credibility to Detective Mercado's out of court statements as to his in court statements made under oath.  Therefore, Detective Mercado's statements in the taped interview would be much less likely to prejudice the jury against the Petitioner. The trial court's admission of the summary and the audiotape containing Detective Mercado's statements cannot be disturbed on due process grounds in a habeas proceeding unless the admission of the evidence rendered the trial fundamentally unfair. <u>Kealohapauleu v. Shimoda</u>, 800 F.2d 1463 (9th Cir. 1986); <u>Batchelor v. Cupp</u>, 693 F.2d 859, 865 (9th Cir. 1982).  Federal Rule of Evidence 801(d)(2), which excludes admissions from the hearsay rule, defines an admission by a party-opponent as a statement offered against a party that is the party's own statement, in either an individual or a representative capacity.  Fed. R. Evid. 801(d)(2)(A).  Federal Rule of Evidence 613(b), concerning extrinsic evidence of prior inconsistent statements of witnesses, states in pertinent part: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."  Fed. R. Evid. 613(b).  Here, the trial court found that Petitioner's statements in the taped interview were admissible as party admissions, as well as prior consistent and prior inconsistent statements.

Pursuant to Federal Rules of Evidence 801(d)(2)(A) and 613(b), the taped interview provided statements that Petitioner had made during his post-arrest interview with Detective Mercado that were inconsistent with some of Petitioner's testimony.  Petitioner opened the door to allow the prosecution to impeach him with his prior inconsistent statements.  After the audiotape was played, Petitioner testified about the statements that he made on the audiotape.  His testimony in this regard was elicited from the prosecution and his own counsel.  Although Detective Mercado's questions and observations were not offered as admissions by a party opponent, or prior consistent or inconsistent statements, the Ninth Circuit and many other circuit courts have

09cv0374

recognized that statements made by a third party in a taped interview are admissible in order to provide context to the defendant's answers.  United States v. Whitman, 771 F.2d 1348, 1351 (9th Cir. 1985); United States v. Flores, 63 F.3d 1342, 1358-59 (5th Cir. 1995); United States v. Catano, 65 F.3d 219, 225 (1st Cir. 1995); United States v. Sorrentino, 72 F.3d 294, 298 (2d Cir. 1995) (overruled on other grounds by United States v. Abad, 514 F.3d 271 (2d Cir. 2008)); United States v. Gutierrez-Chavez, 842 F.2d 77, 81 (5th Cir. 1988).

Further, in Dubria v. Smith, 224 F.3d 995, 1001-1002 (9th Cir. 2000), the Ninth Circuit held that the admission of an unredacted tape and transcript from a petitioner's police interview did not warrant federal habeas corpus relief on due process grounds.  In Dubria, the petitioner claimed constitutional error from the admission of the unredacted tape and transcript of his interview with police detectives.  Dubria, 224 F.3d at 1000.  During the interview, the detectives challenged the petitioner about his explanation of the events and repeatedly told him that no judge or jury would believe him if he stuck to his story.  Id.  The petitioner in Dubria claimed that certain portions of the tape and transcript should have been redacted because one of the detectives made comments and asked questions that contained statements of disbelief in the petitioner's story, opinions concerning the petitioner's guilt, elaborations of the police theory of the victim's death, and references to the petitioner's involvement in the crime.  Id. at 1001.  The Ninth Circuit found that, viewed in its entirety, "the tape and transcript show what the state appellate courts quite properly described as an 'unremarkable interview.'"  Id.  The court also noted that the questions and comments by the detective placed the petitioner's answers in context, much like a prosecutor's questions at trial.  Id.  The court stated that, although the Ninth Circuit has "cautioned that testimony of law enforcement officers often carries the aura of special reliability and trustworthiness, we examine the officers' statements in context to determine whether they fundamentally affect the fairness of the trial."  Id; see United States v. Gutierrez, 995 F.2d 169, 172 (9th Cir. 1993) [quoting United States v. Espinosa, 827 F.2d 604, 613 (9th Cir. 1987)].  The Dubria court found that the detective's statements were questions in a pre-trial interview that gave context to the petitioner's answers.  Dubria, 224 F.3d at 1001-02.  The trial judge in Dubria also provided the jury with cautionary instructions, telling the jury that it was not to consider the

09cv0374

detective's statements for the truth of the matter asserted.  Id. at 1002.  The Ninth Circuit concluded that the petitioner was not able to meet the standard that the admission of the tape and the transcript "so fatally infected the proceedings as to render them fundamentally unfair."  Id; [quoting Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991)].

The Court has reviewed the transcript of the taped interview.  Detective Mercado's statements, taken in context, reveal that his statements were similar to the detective's statements in Dubria.  The statements did not fundamentally affect the fairness of Petitioner's trial, even without a cautionary instruction provided to the jury.  Although during the interview, Detective Mercado expressed his disbelief in Petitioner's version of events, he also stated his concern that he did not know who was telling him the truth.  At trial, the jury heard Detective Mercado's statement in the taped interview, "That's just it.  I don't know who's telling the truth.  I don't know who's lying and who's telling me the truth, okay?"  (Respondent's Lodgment No. 1 at 66.)  Throughout the post-arrest interview, Detective Mercado told Petitioner that the reason he did not believe Petitioner's version of events was that the two other individuals whom he interviewed had told him stories that did not match Petitioner's story.  He stated that he was more inclined to believe the stories told by Jesse and Gardner because their stories were similar.  However, at one point in the interview, Detective Mercado expressed his belief that Gardner had also lied to him.  Mercado said to Petitioner, "Yes, Tony still lied to me."[14/]  Id. at 65.  Since the taped interview also revealed to the jury that Detective Mercado did not know who was lying to him, and that he did not believe one of the men who told him a different version than Petitioner's story, any implication that Detective Mercado simply disbelieved Petitioner was minimal.  As a result, the admission of the taped interview did not violate Petitioner's due process rights.

Moreover, the Court of Appeal's review of the interview transcript revealed that Detective Mercado was concerned that Petitioner's version of the robberies did not comport with the similar stories that both Jesse and Gardner had told Detective Mercado.  Although Detective Mercado told

_____

[14]  Gardner told Detective Mercado that he did not know Petitioner when Petitioner arrived at the Savage home on February 18, 2003.  However, Petitioner stated that Gardner had used Petitioner's phone earlier that day.  (Respondent's Lodgment No. 1 at 62-65.)

Petitioner during the post-arrest interview that he felt that Petitioner may be lying, taken in context, Detective Mercado's statements on the audiotape were not unduly prejudicial to Petitioner.

It is clear from the relevant portions of the taped interview that, even if Petitioner had been able to demonstrate that the admission of Detective Mercado's opinion was erroneous, the error would be harmless. Petitioner has not shown that the alleged "error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Rather, Petitioner's counsel conceded, "but I think the balance of it, unfortunately, is admissible." (Respondent's Lodgment 6 No. at 28.) Petitioner's counsel was given the option of the particular method that would be used to have Detective Mercado's interview with Petitioner brought before the jury, and he chose to have Detective Mercado read the two pages in his report about the interview. (Respondent's Lodgment No. 6 at 29.) When Petitioner denied saying certain things to Detective Mercado during his pretrial interview, Petitioner himself opened the door to allow the prosecutor to impeach him with Detective Mercado's taped interview. Detective Mercado's statements were admissible to provide context to Petitioner's properly admitted prior inconsistent statements and admissions. Accordingly, Detective Mercado's summary of the interview, as well as the audiotape of the interview, were admissible at trial and were not unduly prejudicial to the Petitioner. Therefore, the admission of Detective Mercado's statements did not render Petitioner's trial fundamentally unfair. The Court RECOMMENDS that this claim be **DENIED**.

## VI.   CONCLUSION AND RECOMMENDATION

After a review of the record in this matter, the undersigned Magistrate Judge RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice.

This report and recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

1

**IT IS ORDERED** that no later than August 16, 2010 any party to this action may file

2

written objections with the Court and serve a copy on all parties.  The document should be

3

captioned "Objections to Report and Recommendation."

4

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court

5

and served on all parties no later than August 31, 2010  The parties are advised that failure to file

6

objections within the specified time may waive the right to raise those objections on appeal of the

7

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8

9

10

11

12

DATED:  July 23, 2010

13

14

_____

Hon. William V. Gallo

15

U.S. Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

09cv0374